## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PETER T. MORALES,

       Plaintiff,

vs.                                                           CASE NO.  6:11-cv-336-Orl-TEM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.
_____

## ORDER AND OPINION

This matter is before the Court on Plaintiff's Complaint (Doc. #1), seeking review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB").  Plaintiff filed a Brief opposing the Commissioner's Decision (Doc. #15), and Defendant filed a Memorandum in Support of the Commissioner's Decision (Doc. #17).  The Commissioner has filed the transcript of the underlying administrative record and proceedings (hereinafter referred to as "Tr." followed by the appropriate page number).

Upon review of the record, the undersigned found the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the Court in making its determinations.  Accordingly, the instant matter has been decided on the written record. For the reasons set out herein, **the Commissioner's decision is REVERSED and the case is REMANDED** for additional proceedings.

## I.  Procedural History

On September 28, 2006 Plaintiff protectively filed an application for DIB alleging his disability began October 1, 2006 (Tr. 58).  His claim was denied initially (Tr. 58) and upon request for reconsideration (Tr. 70-71).  On December 13, 2007 Plaintiff filed a request for a hearing by an ALJ (Tr. 72-73).  A hearing was held May 5, 2009, at which Plaintiff was represented by attorney Richard Schwartz (Tr. 24-57).  On June 25, 2009 the ALJ found Plaintiff not disabled (Tr. 12-23) and the Commissioner issued his Notice of Decision - Unfavorable (Tr. 12).  On August 26, 2009 Plaintiff filed a request for review of the hearing decision/order (Tr. 8-9).  On January 7, 2011 the Appeals Council denied review (Tr. 1-7).  Plaintiff's current counsel of record Richard A. Culbertson, Esquire, filed the instant action in federal court on March 4, 2011, requesting that this Court reverse and set aside the decision of the Commissioner, or remand for further proceedings (Doc. #1 at 22-23).

## II.  Background Facts

### A. Basis of Claimed Disability

Plaintiff claims to be disabled since October 1, 2006 as a result of chronic knee pain, arthritis, a history of heart problems, lumbar spine troubles, and various other pains affecting his lower extremities. (Doc. #15 at 3-11; Doc. #17 at 2-3; Tr. 17, 32-44).

### B. Summary of Evidence Before the ALJ

Plaintiff was born October 31, 1961 (Tr. 58) and was forty-seven years old at the time of the hearing.  He has a high school education (Tr. 29) and past relevant work as a bagel maker, police officer, and airport security officer (Tr. 30-32).  Plaintiff's medical history will be summarized herein.

### i. Medical Evidence

A review of the whole medical record reveals Plaintiff's long history of various medical problems.  Beginning in 1990, Plaintiff injured his right knee and ankle in a motor vehicle accident while working as a police officer (Tr. 341, 563).   In 2000, Plaintiff underwent surgery to address certain heart problems (Tr. 253-67).  In more recent years, Plaintiff has struggled with pain in his left knee, lumbar spine, and various other areas of his lower extremities (Tr. 563).

In September of 2001, Plaintiff underwent surgery on his left knee due to avascular necrosis[1] (Tr. 280).  In January of 2002, Plaintiff had nearly full range of motion in the knee and was exercising regularly (Tr. 283, 295).  However, Plaintiff complained of pain while running on the treadmill (Tr. 296, 298).

On June 17, 2002, Plaintiff visited Dr. Donald Huggard complaining of significant left knee discomfort (Tr. 329).  Dr. Huggard found Plaintiff to have good range of motion in the knee and assessed the knee as likely being arthritic (Tr. 329).

On January 6, 2003, Plaintiff once again visited Dr. Huggard complaining of significant knee pain (Tr. 328).  Plaintiff complained of pain during activities and at rest.  *Id.*  Plaintiff further told Dr. Huggard that he had been able to complete a "fun walk" with his children, but the incident caused his knee to hurt for several weeks thereafter**.**  *Id.*  Dr. Huggard noted Plaintiff had 0-130 degree range of motion, medial joint line discomfort, and a "clunk."  *Id.*  Dr. Huggard also noted a visible defect in the knee, but stated it had

---

[1] Avascular necrosis is the pathological death or cells or tissue due to deficient blood supply.  Stedman's Medical Dictionary 1026-27 (William R. Hensyl et al. eds., 25th ed. 1990) [hereinafter Stedman's].

"improved since x-rays taken in 2000." *Id.* Thereafter, Plaintiff would regularly be treated by Dr. William McLeod.

On February 17, 2003, Dr. McLeod treated Plaintiff and determined he would be best served by undergoing a osteochondral allograft[2] (Tr. 326). That surgery was performed on April 7, 2003 by Dr. Peter Indelicato (Tr. 304). Following surgery, Plaintiff regularly visited Dr. McLeod for follow-ups (Tr. 321-25). Through the course of these follow-ups, Dr. McLeod observed that Plaintiff's knee was progressing nicely, that Plaintiff was "doing just fine" (Tr. 322), that Plaintiff was able to exercise regularly (Tr. 321), and that Plaintiff had largely regained his range of motion in the knee having 135 degrees of knee flexion (Tr. 321).

Plaintiff returned to Dr. McLeod on January 30, 2004 once again complaining of left knee pain (Tr. 320). Plaintiff complained of persistent pain in the knee as well as a feeling of instability, but no buckling or locking. *Id.* The knee showed progressive healing from the surgery. *Id.* Plaintiff received a cortisone shot for the pain (Tr. 319-20). Over the course of the next few months, Plaintiff continued to have the knee aspirated and treated with cortisone shots (Tr. 317-20). However, Dr. McLeod ended this treatment on May 26, 2004 noting that it had "not helped out significantly" (Tr. 316). Therefore, Dr. McLeod scheduled arthroscopic knee surgery, wherein a debridement procedure would occur and Plaintiff's then-current orthopaedic hardware would be removed. *Id.* Plaintiff underwent this

---

[2] "Osteochondral allografting is one of several types of cartilage transplant procedures used in the treatment of individuals with symptomatic, disabling cartilage injury or disease." Blue Cross Blue Shield of Tennessee Medical Policy Manual (2012), *available at* http://www.bcbst.com/mpmanual/Osteochondral_Allografting.htm.

4

procedure on July 20, 2004 (Tr. 314).  One month later, Plaintiff expressed he felt ready

to return to work (Tr. 312-13).  Dr. McLeod observed in December of 2004 that the knee

looked "very good" with "good range of motion" despite a recurrence of some symptoms,

which Plaintiff believed related to changes in the weather.  *Id.*

On March 14, 2005, Plaintiff, complaining of severe left knee pain, was treated by

Dr. Charles Kollmer, a treating physician (Tr. 443).  Specifically, Plaintiff complained of

clicking, popping, and difficulty "with all activities of daily living."  *Id.*  Upon examining

Plaintiff, Dr. Kollmer observed there was crunching and clunking sounds in the left knee,

tenderness in the medial and lateral joint lines, and left knee flexion of 110 degrees.  Dr.

Kollmer concluded Plaintiff was suffering from severe degenerative joint disease in the left

knee (Tr. 444).  Dr. Kollmer concluded that total knee arthroplasty[3] was the appropriate

course of treatment (Tr. 445).  Plaintiff was permitted to continue working.  *Id.*

On April 18, 2005, Plaintiff underwent total knee arthroplasty and had a pain pump

inserted (Tr. 370).  Following surgery, Dr. Kollmer observed Plaintiff was progressing well

and that the surgery was a success (Tr. 436-42).  Plaintiff was able to return to work as an

airport screener a little more than a month after the surgery and had "good range of motion"

by October of 2005 (Tr. 437, 441).  By August 29, 2005, Plaintiff was biking three times a

week (Tr. 439).  However, after being taken off pain medications, Plaintiff once again began

to complain of aches and pains in the left knee (Tr. 436-38).

In December of 2005, Dr. Kollmer concluded Plaintiff was a candidate for "an

arthroscopy for debridement of arthrofibrosis of [the] left knee" (Tr. 436).  On December 21,

---

[3] Total join arthroplasty is a procedure wherein "both joint surfaces are replaced with
artificial materials . . . ."  Stedman's, *supra* note 1, at 136.

2005, Plaintiff underwent arthroscopic debridement[4] and had a pain pump inserted (Tr. 362).  Following surgery, on February 27, 2006, Plaintiff was progressing well and able to work and exercise (Tr. 433-35).  Moreover, Plaintiff had "5/5 motors throughout with no objective sensory changes" and good range of motion in the knee (Tr. 433).

Plaintiff returned to Dr. Kollmer on August 2, 2006 complaining of pain in the right hip and knee (Tr. 431).  Dr. Kollmer noted Plaintiff's left knee was stable following the total knee arthroplasty and Plaintiff had "some chronic" pain about the left knee which was being treated by Lortab.  *Id.*  Dr. Kollmer further observed that Plaintiff had good range of motion in his low back and decreased range of motion in the right hip, as well as some pain in the right hip (Tr. 432).  Dr. Kollmer concluded Plaintiff was suffering from a right knee sprain, mild degenerative joint disease affecting the right hip, and a right hip strain.  *Id.*  Dr. Kollmer issued Plaintiff a doctor's note stating that Plaintiff was only to work six hours a day, five days a week (Tr. 428).  In a letter dated September 19, 2006, Dr. Kollmer expressed that Plaintiff would not be able to meet the job requirements of a TSO officer (Tr. 429-30). Specifically, Dr. Kollmer stated Plaintiff could not lift the seventy pounds required by TSA, could not continuously stand or walk for one to four hours, and would be very limited in "bending, reaching, stooping, squatting, standing, and walking" due to his "joint difficulties" (Tr. 430).

During this time, Plaintiff met with Dr. Francis Reed, a treating physician, regarding the health of his heart (Tr. 420-27).  Despite Plaintiff's continued smoking, his heart health was not of serious concern to his treating physicians (Tr. 420, 425).  Specifically, Dr. Reed

---

[4] Debridement is the process of excising "devitalized tissue and foreign matter from a wound."  Stedman's, *supra* note 1, at 401.

stated Plaintiff was a "low cardiac risk" (Tr. 500) who needed only to end his tobacco habit and aggressively manage his lipids (Tr. 420).  Further, Dr. Reed observed that Plaintiff had "evidence of old myocardial infarction in the anterolateral wall with well preserved left ventricular systolic function . . . and no evidence of ischemia."[5]  *Id.*

Plaintiff was examined by Dr. Alvan Barber, a consultative examining physician, on February 14, 2007 (Tr. 461-67).  Plaintiff stated he suffered from pain and instability in his left knee as well as pain in his lower back and buttocks area (Tr. 461).  Plaintiff stated he could only "walk approximately 5 minutes, stand approximately 5 minutes [], sit approximately 5 minutes, [and] lift approximately 15 pounds."  *Id.*  Dr. Barber's examination revealed Plaintiff had a sitting hip flexion of 90 degrees bilaterally, could lie flat on the exam table, possessed 5/5 strength in the left and right lower extremities, had left knee flexion of up to 130 degrees, had seventy degrees of right hip flexion, had ten degrees of right hip extension, and had normal range of motion in the lumbar spine (Tr. 463, 465-66).  However, Plainitff walked with difficulty and a limp; was unable to walk on toes or heels, or squat; and exhibited pain in the knees and right hip (Tr. 463).  Dr. Barber concluded Plaintiff could be limited in standing and walking for long periods of time due to pain (Tr. 464).  Dr. Barber stated Plaintiff "could be limited to activities that require the use of upper body movements and coordinated activities with hands."  *Id.*

On March 6, 2007, Plaintiff was examined by Dr. Robert Wesley, a state agency

---

[5] Myocardial infarction is the "sudden insufficiency of arterial or venous blood supply due to emboli, thrombi, vascular torsion, or pressure that produces a mascopic area of necrosis" creating "indicative changes across the precordium as well as in leads I and a VL." Stedman's, *supra* note 1, at 779.  Ischemia is "[l]ocal anemia due to obstruction (mainly arterial narrowing) of the blood supply."  *Id.* at 803.

physician (Tr. 469-75). Dr. Wesley found that Plaintiff was limited in his lower extremities, could occasionally lift twenty pounds, could frequently lift ten pounds, could stand or walk at least two hours in a regular work day, and could sit about six hours in a normal work day (Tr. 469). Dr. Wesley further found Plaintiff could occasionally stoop, kneel and crawl, but could never balance, crouch, or kneel (Tr. 470). Dr. Wesley concluded that Plaintiff's claims of pain exceeded expectation and were "disproportionate" (Tr. 473).

Dr. Carlos Sanchez performed a consultative examination of Plaintiff on July 10, 2007 (Tr. 476-78). Plaintiff complained of pain in both knees – particularly the left knee – as well as pain in his hips and low back (Tr. 476). Dr. Sanchez found Plaintiff had "moderate decreased" range of motion in the lumbar spine, decreased range of motion and flexion in the left knee, and decreased range of motion of external rotation of his right hip (Tr. 477-78). Dr. Sanchez noted Plaintiff walked "with an obvious limp" but possessed 4/5 strength in the lower extremity (Tr. 478).

Additionally, Dr. Sanchez reviewed x-rays and MRIs of Plaintiff's knees and lumbar spine (Tr. 476-78). The MRIs revealed "broad-based posterior discomfort protrusion at L3-L4 as well as "foramental narrowing at L4-L5" (Tr. 476). A review of Plaintiff's x-rays showed mild bone spurring, but "[o]therwise good disk space," in the lumbar spine and arthritic changes throughout the left knee (Tr. 478). Dr. Sanchez concluded Plaintiff suffered from chronic bilateral knee pain, bilateral hip pain, and lumbar back pain. *Id.* Dr. Sanchez stated Plaintiff "would have a difficult time maintaining any job that required standing or sitting." *Id.*

On August 1, 2007, Plaintiff was examined by Dr. Reuben Brigety, a state agency physician (Tr. 483-90). Dr. Brigety found Plaintiff could occasionally lift ten pounds, could

8

frequently lift less than ten pounds, could stand or walk at least two hours in a normal workday, could sit for about six hours in a normal workday, and was limited in the lower extremities (Tr. 484).  Dr. Brigety also found that Plaintiff could occasionally balance, stoop, kneel, crounch, and crawl (Tr. 485).  Dr. Brigety's notations indicate that he found Plaintiff's allegations of pain credible (Tr. 488).

Plaintiff met with Dr. Reed for a follow-up in August of 2007 (Tr. 506).  Plaintiff reported no cardiac complaints, and Dr. Reed found no cause for concern regarding Plaintiff's cardiac health (Tr. 505-06).  Plaintiff stated he was getting aerobic exercise  by bicycling twice a week, though it was causing pains for his back and hip sometimes (Tr. 506).

Plaintiff returned to Dr. Kollmer on August 28, 2007 complaining of pain in his lower back and right hip (Tr. 496).  The examination of Plaintiff revealed "positive hyperextension test, positive posterior iliac crest tenderness with paraspinal muscle spasm and decreased forward flexion."  *Id.*  MRIs taken in July of 2007 revealed facet arthropathy at L5-SI, broad based disc annular buge with facet joint anthropathy at LF-5, and broad based disc protrusion at L3-4.  *Id.*  Dr. Kollmer noted the hips appeared to be normal.  *Id.*  Dr. Kollmer's diagnosis was pain emanating from the total knee arthroplasty, degenerative joint disease, a lumbosacral strain with degenerative changes, disc bulging at L3-4 as well as  L4-5, and a mild right hip strain.  *Id.*  Dr. Kollmer referred Plaintiff to Dr. Vinod Malik for epidural steroid injections (Tr. 494, 495-96).

Plaintiff began receiving epidural steroid injections in October of 2007 (Tr. 494).  Plaintiff told Dr. Malik that he was having difficulty bicycling and placed his pain level anywhere between VAS level two and nine.  *Id.*  On the patient information form, Plaintiff

9

stated the pain began in April of 2005 "for no reason" and he was currently taking upward of seventeen pills a day for his various ailments (Tr. 563-66).   Per Dr. Kollmer's recommendation, Plaintiff received a series of epidural steroid injections from Dr. Malik in October and November of 2007 (Tr. 491-93).   Plaintiff reported the injections were not offsetting the pain (Tr. 491).

On February 4, 2008, Dr. Kollmer performed a functional anesthetic discogram on Plaintiff (Tr. 513-514).   The discography showed changes at L2-3, L3-4, and L4-5 (Tr. 511). Dr. Kollmer noted the changes were particularly demonstrable at L-3-4 and L4-5.  *Id.*  The discography demonstrated improvement and functional improvement at L3-4 and L4-5.  *Id.* Plaintiff stated the numbing medication assisted him for several hours until he tried to do certain activities which caused the irritation and pain to return.  *Id.*  Plaintiff was unable to tell Dr. Kollmer what activities caused his pain to return.  *Id.*  A physical examination performed by Dr. Kollmer on February 14, 2008 showed a positive hyperextension test, positive posterior iliac crest tenderness with paraspinal muscle spasm and decreased forward flexion, as well as pain in the lower extremities.  *Id.*  Based on this, Dr. Kollmer concluded that Plaintiff was a candidate for decompression at L3-4 and L4-5 (Tr. 512).  It was Dr. Kollmer's opinion that the X-STOP procedure[6] would be most reasonable.  *Id.*

---

[6] The X-STOP procedure is described as follows: "The tiny titanium device is shaped like a bird with two sets of wings, and is designed to fit between spinal processes, the small bony protrusions that jut out from the spinal column toward the back.  A surgeon makes a small and relatively superficial incision, and carefully places the X-stop in the effected area. The "wings" secure the implant between the spinal processes, so that X-stop remains in place without attaching to the bone or ligaments in the back." *X-stop Procedure Helps Relieve Pain as a Result of Spinal Stenosis*, News Medical (Nov. 20, 2007), http://www.news-medical.net/news/2007/11/20/32714.aspx.

Plaintiff returned to Dr. Kollmer on February 28, 2008 (Tr. 510).  Plaintiff continued to complain of significant lower back pain.  *Id.*  Plaintiff stated the pain was weather sensitive and he had "good days and bad days."  *Id.*  Dr. Kollmer's prognosis remained unchanged and once again recommended the X-STOP procedure.  *Id.*  Plaintiff agreed to the procedure.  *Id.*

Plaintiff returned to Dr. Malik in October of 2008 seeking assistance with his back and leg pain (Tr. 548).  However, Plaintiff was not interested in Dr. Malik's recommendation of an epidural steroid injection; rather, Plaintiff sought further prescriptions of Lortab, which he was taking eight times a day.  *Id.*  Dr. Malik, worried of possible opiate addiction, declined to fill the prescription.  *Id.*  Plaintiff decided to go to his primary physician for the prescription and return to Dr. Malik if he wanted an epidural steroid injection.  *Id.*

Seeking a second opinion regarding the X-STOP procedure, Plaintiff saw Dr. Frederico Vinas, a consultative examining physician, on November 17, 2008 (Tr. 601). Plaintiff's chief complaint was low back pain, which he stated began he 2006 "when he bent over."  *Id.*  Plaintiff further described the pain as constant, sharp, and progressively getting worse.  *Id.*  Dr. Vinas observed that Plaintiff was resting comfortably, spoke clearly and concisely,  was alert and oriented, and was able to follow single and multi-step commands accurately (Tr. 602).  Dr. Vinas further noted Plaintiff had 5/5 muscle strength in all muscle groups of both the lower and upper extremities, as well as decreased range of motion and discomfort in the lumbar spine (Tr. 603).  Plainitff had a "natural gait with normal posture, width of stance, and length of stride."  *Id.*  Dr. Vinas' impression was that Plaintiff was suffering from severe lumbar spondylosis and chronic back pain.  *Id.*  Dr. Vinas recommended Plaintiff maximize conservative treatment before undergoing the X-STOP

11

procedure; however, the X-STOP procedure did not strike Dr. Vinas as an unreasonable mode of treatment if all else failed (Tr. 604).  Dr. Vinas also noted Plaintiff had undergone a total knee arthroplasty and was "doing very well."  *Id.*  Plaintiff was counseled to avoid "repetitive bending or twisting of the spine," lifting weights in excess of fifteen pounds, and activity that would increase the stress over the lumbar spine.  *Id.*

Plaintiff returned to Dr. Kollmer on April 21, 2009 following Plaintiff's insurer's decision to deny coverage for the X-STOP procedure on the grounds that it was experimental (Tr. 598).  Plaintiff complained of low back pain and ambulatory difficulties, but showed improvement with forward flexion and sitting.  *Id.*  Dr. Kollmer observed effusion in the left knee, but x-rays taken that day revealed "no acute fractures, subluxations[7] or dislocations and no signs of migration, subsidence or loosening."  *Id.*  Dr. Kollmer scheduled Plaintiff for an MRI.  *Id.*  The MRI, dated May 15, 2009, revealed degenerative changes of the lumbar spine at L4-5 as well as L3-4 (Tr. 606).  Additionally, there was moderate foraminal narrowing on the right at L3-4, moderate-to-sever narrowing on the right at L4-5, and moderate narrowing on the left at L4-5.  *Id.*

Plaintiff underwent additional surgery on his knee in June of 2009 (Tr. 608).  Plaintiff underwent arthroscopy of the left knee with debridement and insertion of a pain pump.  *Id.*  Dr. Kollmer's diagnosis was arthrofibrosis of the left knee.  *Id.*

### ii. Plaintiff's Testimony

At the hearing, Plaintiff testified that he was suffering from knee problems and lower back problems (Tr. 32, 35).  Plaintiff acknowledged that despite a history of coronary

---

[7] Subluxation is defined as "an incomplete luxation or dislocation; though a relationship is altered, contact between joint surfaces remains."  Stedman's, *supra* note 1, at 1494.

problems, that was currently not an issue for him (Tr. 37).  Plaintiff stated he had chronic pain in the left knee, the left knee was constantly swollen, the knee made clicking sounds, and the pain persisted regardless of the weather or the activity – standing, sitting, bending, squatting – Plaintiff was engaged in (Tr. 33, 45-46).  Plaintiff stated that five to ten minutes into the hearing his feet had gone numb, he had pain running down his right leg, his lower back was bothering him, and his left knee was giving him problems (Tr. 38).  Plaintiff stated he had undergone a left knee replacement in 2004 or 2005 and it had brought him no relief (Tr. 33).  Plaintiff claimed to have problems with the right knee, but stated the right knee was far less problematic and painful than the left (Tr. 34).  Plaintiff testified he suffered pain in his back most of the day (Tr. 35).  Plaintiff stated this pain was more concentrated in the groin and buttocks area, but it sometimes ran down his legs and created a tingly sensation in his feet.  *Id.*  Plaintiff stated this tingly feeling was the result of a numbing of the legs and feet, which he claimed occurred around eighty percent of the day.  *Id.*  Plaintiff also stated he has had instances where the leg becomes "totally numb."  *Id.*

Regarding his ability to work, Plaintiff stated he would be unable to work given his pain and medical problems (Tr. 38, 48-49).  Plaintiff stated he has experienced these symptoms "for a number of years" and he felt he could not be productive if he were not feeling well (Tr. 38).  Plaintiff also stated his daily medications relieve the pain somewhat, but they make him groggy (Tr. 39, 45).  Moreover, Plaintiff stated he volunteers on days when he feels physically able but his pain is so random that he has gone months without volunteering (Tr. 47).

### C. Summary of the ALJ's Decision

A plaintiff may be entitled to disability benefits under the Social Security Act if he or

13

she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits.[8] *See* 20 C.F.R. §§ 404.1520[9]; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).

In the instant case, the ALJ found Plaintiff met the Social Security Act's insured status requirements through December 31, 2011 (Tr. 17). At step one of the sequential evaluation process, the ALJ found Plaintiff had not engaged in substantial gainful activity since October 1, 2006, the beginning of the time period under consideration. *Id.* At step two, the ALJ found Plaintiff suffered from the severe impairments of "left knee disorder status post left knee replacement surgery, right knee disorder status post right knee replacement surgery, lumbar spine disorder with associated hip and leg pain, history of coronary artery disease post myocardial infarction." *Id.* At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that meets or medically

---

[8] First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f). A plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

[9] Unless otherwise specified, all references to 20 C.F.R. will be to the 2012 edition.

equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 28). At step four, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform a range of sedentary work (Tr. 18).[10]  With this RFC, the ALJ found Plaintiff was not capable of performing any of his past relevant work (Tr. 21).  At step five the ALJ found there were other jobs existing in the national economy that Plaintiff could perform, such as food and beverage clerk, compact assembler, and table worker (Tr. 22).  Therefore, the ALJ found Plaintiff was not under a disability since October 1, 2006, the alleged onset date (Tr. 34).

### III.  Standard of Review

The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence.  *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a

---

[10] Specifically, the ALJ found:

> The claimant is able to lift and carry 10 pounds occasionally and lesser weights frequently.  He is able to stand and walk for 2 hours in an 8 hour workday and sit for 6 hours in an 8 hour workday.  The claimant requires the option to change positions at will for brief periods throughout the workday. The claimant can never climb ropes, ladders, or scaffolds.  He can occasionally climb ramps and stairs and can occasionally balance, stoop, kneel, crouch, and crawl.  The claimant can not be exposed to workplace hazards such as dangerous moving machinery and unprotected heights. The claimant is further limited to performing routine uncomplicated work tasks due to pain and the side effects of medication.

(Tr. 18).

suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *see also Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) ("In sum, findings of fact made by administrative agencies . . . may be reversed by this court only when the record compels a reversal."). The district court must view the evidence as a whole, taking into account evidence favorable, as well as unfavorable, to the decision. *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so. While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, a plaintiff bears the ultimate burden of

proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments.  *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.").  It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove disabling physical or mental functional limitations.  20 C.F.R. § 404.704.

## IV.  Analysis

Plaintiff raises two issues on appeal.  First, Plaintiff argues the ALJ failed to apply the correct legal standard to the opinion evidence of Plaintiff's treating physicians (Doc. #15 at 11).  Plaintiff argues that the ALJ failed to articulate "good cause" for discounting the opinion of Dr. Kollmer (Doc. #15 at 12-15).  Additionally, Plaintiff argues that the opinions of other physicians were either not addressed at all or were addressed in an inadequate manner (Doc. #15 at 15-17).  The Commissioner argues the ALJ provided good cause to discount Dr. Kollmer's opinion, and addressed all pertinent parts of other opinions (Doc. #17 at 15-19).  For those physicians not mentioned, the Commissioner argues the ALJ was not required to refer to every piece of evidence in her decision (Doc. #17 at 19-20).

Second, Plaintiff argues the ALJ failed to apply the correct legal standards in discounting the credibility of his pain testimony (Tr. 17-21).  Plaintiff argues the ALJ engaged in "sit and squirm" jurisprudence and his conclusion is not supported by substantial evidence (Doc. #15 at 17-21).  The Commissioner argues the ALJ's conclusion regarding Plaintiff's credibility is supported by substantial evidence, including the objective

medical evidence and Plaintiff's demeanor evidence at the hearing (Doc. #17 at 20-23).

## A.    The Opinion Evidence

In the instant case, Plaintiff alleges the ALJ failed to apply the correct legal standard to the medical opinions of Dr. Kollmer, Dr. Sanchez, and Dr. Malik (Doc. #15 at 11-17). The undersigned will address each doctor in turn.

### i.    Dr. Kollmer

Plaintiff argues that the ALJ failed to articulate good cause to discount the opinion of Dr. Kollmer, a treating physician.  The undersigned agrees.

Case law and the Regulations provide that an ALJ may discount the opinion of a treating physician where there is good cause to do so.  *See, e.g., Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011).  The Eleventh Circuit has concluded "good cause" exists when:  (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or, (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Phillips v. Barnhart,* 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  "Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence," a reviewing court cannot "disturb the ALJ's refusal to give the opinion controlling weight."  *Carson v. Comm'r of Soc. Sec.*, 300 Fed. Appx. 741, 743 (11th Cir. 2008) (per curiam) (citations omitted).[11]

---

[11] Unpublished opinions may be cited throughout this report and recommendation as persuasive on a particular point.  The Court does not rely on unpublished opinions as precedent.  Citation to unpublished opinions on or after January 1, 2007 is expressly permitted under Rule 32.1, Fed. R. App. P.  Unpublished opinions may be cited as

(continued...)

Here, the ALJ noted that it was Dr. Kollmer's opinion that Plaintiff could lift or carry no more than seven pounds, and could work no more than six hours a day, five days a week (Tr. 20).  The ALJ discredited this opinion on the grounds that Dr. Kollmer had previously stated that Plaintiff could continuously stand or walk for one to four hours, that the medical reports and record as a whole contradicted Dr. Kollmer's opinion, and that the opinion was conclusory and not explained.  *Id.*

Upon review of the record, it is clear that the ALJ has distorted Dr. Kollmer's opinion. This type of error alone has been found to constitute reversible error.  *See Reddick v. Chater*, 157 F.3d 715, 723 (9th Cir. 1998) (remanding where the ALJ's "paraphrasing of record material is not entirely accurate regarding the content or tone of the record.").  In the first instance, the ALJ asserted Dr. Kollmer had contradicted himself by stating Plaintiff could walk or stand continuously for one to four hours.  *Id.*  However, Dr. Kollmer did not say that Plaintiff could walk or stand *continuously* for one to four hours; rather, Dr. Kollmer determined that Plaintiff "*would not be able to continuously* stand for one to four hours due to his underlying joint difficulties . . . ." (Tr. 430).  This misrepresentation is significant because the ALJ found Plaintiff was capable of standing and walking for two hours in an eight hour workday (Tr. 21).  Thus, the ALJ left unexplained why Dr. Kollmer's opinion that Plaintiff could not walk continuously for one to four hours was discredited.  Moreover, Dr. Kollmer's opinion could be seen as supported by other medical evidence such as the opinions of Dr. Barber and Dr. Sanchez.  Dr. Barber determined Plaintiff could be limited in standing and walking for long periods of time due to pain (Tr. 464).  Further, Dr. Barber

---

[11](...continued)
persuasive authority pursuant to the Eleventh Circuit Rules.  11th Cir. R. 36-2.

stated that, because of pain, Plaintiff could be limited to activities requiring the use of the upper body. *Id.* Additionally, Dr. Sanchez found Plaintiff's pain would make it difficult for him to maintain a job that required standing (Tr. 478).

The ALJ also misconstrued the opinion of Dr. Kollmer when she asserted that it was Dr. Kollmer's opinion that Plaintiff could only lift or carry seven pounds (Tr. 20). The ALJ supported this by citing contrary evidence in the record. *Id.* In fact, Dr. Kollmer proffered that Plaintiff would not be able to lift or carry *seventy* pounds, as required by his previous job as an airport screener, but nowhere else in the record does Dr. Kollmer state that Plaintiff can carry or lift no more than *seven* pounds as alleged by the ALJ.[12] Although the ALJ noted that Plaintiff had stated to Dr. Barber, and testified at the hearing, that he could carry between fifteen and twenty pounds, the undersigned is nonetheless concerned that mistakes such as those examined herein do not reflect a careful and thorough review of the record. *See Tyndall v. Astrue*, No. 3:10-cv-234-J-32TEM, 2011 WL 4029398, at *11 (M.D. Fla. Aug. 11, 2011) (remanding, in part, due to ALJ's repeated misrepresentations of the record).

The ALJ also reasoned that Dr. Kollmer's opinion regarding Plaintiff's work hour limitations was conclusory and the record indicated greater functional capacity. *Id.* Specifically, the ALJ criticized the opinion for failing to articulate why Plaintiff was limited

---

[12] In addition to the portions of Dr. Kollmer's opinions discussed above, the undersigned would also note that the ALJ misstated the record in other places as well, such as by referring to Dr. Sanchez as Dr. Shoemaker. *See Lamp v. Astrue*, No. 3:07-cv-93-J-TEM, 2008 WL 906641, at *3 (M.D. Fla. Mar. 31, 2008) (remand appropriate where ALJ misquotes the record); *Goulet v. Astrue*, No. 3:06-cv-975-J-TEM, 2008 WL 681049, at *3 (M.D. Fla. Mar. 2, 2007) (same).

to six, rather than eight, hours.[13]  *Id.*  However, the discounted opinion was issued on the same day that Dr. Kollmer conducted an orthopaedic exam on Plaintiff (Tr. 428, 431-32). During that medical exam, Dr. Kollmer provided copious notes detailing his findings as based on observation, medical signs, and laboratory findings (Tr. 431-32).  Clearly, Dr. Kollmer's conclusion regarding Plaintiff's work hour limitations was part and parcel to his observations and findings made on that very same day.  Moreover, the ALJ found that "the record as a whole indicate[d] a greater functional capacity than Dr. Kollmer's statement [regarding the work hour limitation] indicates" (Tr. 20).  However, the ALJ did not explain what evidence in the record contradicts this opinion.[14]  Therefore, it is impossible to determine if this conclusion is based on substantial evidence.  *See Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (finding the ALJ must specifically state the weight given to the evidence and why he came to that decision); *Youngblood v. Astrue*, No. 3:11-cv-128-J-MCR, 2012 WL 640739, at *5 (M.D. Fla. Feb. 28, 2012) (holding ALJ must state with specificity the evidence that supports his conclusions that treating physician's opinion was inconsistent with record and more limiting than was suggested by the record).  A reviewing court may not substitute its judgment for that of the Commissioner's to provide an adequate

_____

[13] While the ALJ was correct in implying that more weight will be given to a well-explained opinion, see 20 C.F.R. § 404.1527(c)(3), explanations are but one consideration in determining what weight to give a medical opinion in addition to other factors such as whether relevant, objective medical evidence supports a doctor's opinion.  *Id.*

[14] It is unclear from the record whether this restriction was intended to be permanent or temporary.  The restriction coincided with Dr. Kollmer's examination that revealed mild degenerative joint disease affecting the right hip with evidence of a hip sprain, and mild right knee sprain (Tr. 432).  Dr. Kollmer did not select "permanent restrictions" on the medical report form (Tr. 428).  However, there is also no indication that he ever released Plaintiff back to full-time work.  Dr. Kollmer did not refer to the work hour restriction in his September 19, 2006 letter (Tr. 429-30).

explanation where none has been provided.  *See, e.g.*, *Davis v. Comm'r of Soc. Sec.*, 449 Fed. Appx. 828, 833 (11th Cir. 2011) (per curiam).

For the aforementioned reasons, the undersigned finds the ALJ did not properly discredit Dr. Kollmer's opinions.  Accordingly a remand for full consideration of Dr. Kollmer's opinion is required.[15]

### ii.   Dr. Sanchez

Plaintiff argues that the ALJ erred in considering the opinion of consulting examiner Dr. Sanchez.  Specifically, Plaintiff argues the ALJ overlooked pertinent portions of Dr. Sanchez's opinion.  The undersigned agrees.

While the ALJ is not required to specifically refer to every piece of evidence used in making his decision, the ALJ's decision as a whole must be supported by substantial

---

[15] Although Plaintiff asks for reversal and the award of benefits, the undersigned notes that the failure to adequately evaluate all of the opinions of the treating providers no longer requires the Court to accept the opinion as true.  *See Lawton v. Comm'r of Soc. Sec.*, 431 Fed. Appx. 830, 835 (11th Cir. 2011) (per curiam).  As the Eleventh Circuit recently noted:

> We recognize that in *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986), this Court concluded that the Commissioner must accept as true a treating physician's opinion if the Commissioner ignored or failed to properly refute it.  Our earlier precedent, however, remanded cases in which the ALJ failed to adequately explain the weight given doctors' opinions.  *See, e.g.*, *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985); *Wiggins v. Schweiker*, 679 F.2d 1387, 1390 (11th Cir. 1982).  To the extent *MacGregor* is inconsistent, under the prior panel precedent rule, we are bound by the holding of the first panel to address an issue of law, unless and until it is overruled by this Court sitting en banc or the Supreme Court.  *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1986) (en banc).  Thus, rather than accept the ignored treating doctor's opinion as true and remand for the award of benefits, we remand to the agency to determine in the first instance the proper weight to be afforded the treating doctor's opinion.

*Dempsey v. Comm'r of Soc. Sec.*, 454 Fed. Appx. 729, 732 n.5 (11th Cir. 2011) (per curiam).

evidence in the record.  *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11ᵗʰ Cir. 2005).  A decision is not based upon substantial evidence if it focuses on one aspect of the evidence while disregarding other contrary evidence.  *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11ᵗʰ Cir. 1986).  Failure to specify the weight given to evidence contrary to the ALJ's decision, or the reason for giving no weight, has been found to be reversible error.  *See Sharfarz v. Bowen*, 825 F.2d 278, 279 (11ᵗʰ Cir. 1987); *Krueger v. Astrue*, No. 2:06-cv-465-Ftm-29SPC, 2008 WL 596780, at *11 (M.D. Fla Feb. 29, 2008) (quoting *Nyberg v. Comm'r*, 179 Fed. Appx. 589, 590 (11ᵗʰ Cir. 2006)).

The ALJ stated she gave significant weight to the opinion of a Dr. James Shoemaker (Tr. 20).  The undersigned notes there is no record of a consultative examination by Dr. Shoemaker.  However, Dr. Sanchez conducted an examination on July 10, 2007, the date cited by the ALJ.  Thus, it appears the ALJ intended to cite to this report and the reference to Dr. Shoemaker was mere clerical error.  Although the ALJ gave significant weight to Dr. Sanchez's opinion, she failed to address the portion of Dr. Sanchez's opinion wherein he found that Plaintiff "would have a difficult job maintaining any job that required standing or sitting" (Tr. 478).

Here, the opinion of Dr. Sanchez is capable of two interpretations.  Either Dr. Sanchez determined 1) Plaintiff would have a difficult job maintaining any job where sitting or standing was involved, or 2) Plaintiff would have a difficult job maintaining any job that required sitting *or* standing exclusively.  One interpretation can be seen as supporting the ALJ's ultimate conclusion, and one undercuts it.

It is clear that it is the province of the Commissioner to draw inferences from the

23

record.  *Celebrezze v. O'Brient*, 323 F.2d 989, 990 (5th Cir. 1963)[16]; *Salisbury v. Astrue*, No. 8:09-CV-2334-T-17TGW, 2010 WL 5888674, at *2 (M.D. Fla. Nov. 12, 2010).   Where substantial evidence supports the inference, it is not to be overturned.  *Calebrezze*, 323 F.2d at 990.  It is not the function of the Court to resolve conflicts in the evidence.  *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (per curiam).  Therefore, "when the ALJ fails to state with at least some measure of clarity the grounds for his decision, [the court] will decline to affirm simply because some rationale might have supported the ALJ's conclusion."  *Winschel*, 631 F.3d at 1179 (internal quotations omitted).

While it is possible that the ALJ considered this very pertinent part of Dr. Sanchez's opinion, without clearly articulated grounds for why this ambiguous statement supports the ALJ's decision, the Court cannot ascertain whether the ALJ's conclusions were rational and based on substantial evidence.  *See id.*  Indeed, such articulation seems especially important where ambiguous opinions are at issue given that, without such explanation, the Court is left to wonder, not only how the ALJ may have found this evidence to accord with their conclusion, but also whether the ALJ considered the evidence at all.  *See, e.g.*, *Adorno v Shalala*, 40 F.3d 43, 47-48 (3rd Cir. 1994) (finding that lack of mention of a treating physician precluded court from determining whether decision was based on substantial evidence).

For the foregoing reasons, the undersigned finds the ALJ erred in evaluating Dr. Sanchez's opinion.

---

[16] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

### iii.    Dr. Malik

Plaintiff argues the ALJ failed to state the weight she afforded the opinion of Dr. Malik, a treating physician.  The undersigned agrees.

Failure to state with particularity the weight given to medical opinions or the reasons for rejecting a medical opinion is reversible error.  *Sharfarz*, 825 F.2d at 279.  Moreover, the Eleventh Circuit has found a court should decline to affirm "simply because some rationale might have supported the ALJ's conclusion."  *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984).  Therefore, failure to consider the medical opinion of a physician has been found to be reversible error.  *See Winschel*, 631 F.3d at 1178-79 (remanding on the basis that the failure to mention the claimant's physician's medical opinion and the failure to describe the weight it was given deprived the court of the ability to ascertain whether substantial evidence supported the ALJ's decision); *see also Adorno*, 40 F.3d at 47-48 (remanding on the basis that the ALJ and the district court failed to consider the opinion of one of the claimant's treating physicians).  "Without the ALJ stating the specific weight given to different medical opinions and the reasons therefor, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence." *See, e.g.*, *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

The ALJ failed to mention or reference Dr. Malik at all in her decision.  Thus, the Court must first determine whether Dr. Malik is a treating physician and whether Dr. Malik offered a medical opinion before assessing whether the ALJ erred in failing to address Dr. Malik's records.

A treating physician is a medical professional "able to provide a detailed, longitudinal

25

picture" of the claimant's medical impairments and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Lewis*, 125 F.3d at 1440.  The regulations further define a treating physician as someone

> who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with [a physician] when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical conditions.

*Freeman v. Astrue*, 441 Fed. Appx. 571, 574 n.2 (10th Cir. 2011) (quoting 20 C.F.R. §§ 404.1502, 416.902) (alteration in original).  Generally, two or more visits with a doctor will qualify that doctor as a treating physician; however, the nature of the relationship is nevertheless of some importance.  *See Milner v. Barnhart*, 275 Fed. Appx. 947, 948 (11th Cir. 2008) (per curiam) (finding doctor to not be a treating physician based off of one visit with claimant)*; Blades v. Astrue*, No. 3:09-CV-430-J-34MCR, WL 3490215, at *11 (M.D. Fla. Aug. 5, 2010) (finding that a treating relationship existed where doctor visited claimant at least three times); *Morrison v. Astrue*, No. 08:-80886-CIV, WL 3295113, at *21-23 (S.D. Fla. Oct. 13, 2009) (finding doctors to be treating physicians and putting emphasis on the nature of the relationship in one case); *Cronon v. Barnhart*, 244 Fed. Supp. 2d 1286, 1293 n.1 (N.D. Ala. 2003) (seeing claimant three times and conducting tests that no other doctor performed qualified doctor as a treating physician); *Freeman*, 441 Fed. Appx. at 574 (finding doctor was not a treating physician where doctor saw claimant three times based off of the nature of the relationship).

Here, Plaintiff visited Dr. Malik on four separate occasions over the course of a year (Tr. 491-93, 548).  During these visits, Dr. Malik administered injection therapy to Plaintiff, diagnosed and made recommendations for treatment, and scheduled follow-ups (Tr. 491-93, 548-67).  *See, e.g.*, *Blades*, 2010 WL 3490215, at *11 (finding that doctors notes indicating follow-ups *alone* evidenced an ongoing treatment relationship).  Moreover, Dr. Malik diagnosed Plaintiff.  *See, e.g.*, *Morrison*, 2009 WL 3295113, at *22-23 (finding that diagnoses bolstered conclusion that doctors were treating physicians).  Accordingly, Dr. Malik is a treating physician.

However, simply being a treating physician is not what binds the ALJ to give substantial weight to that doctor's opinion.  *See Lewis*, 125 F.3d at 1440.  Only when a "medical opinion" is issued by the treating physician must the ALJ give it considerable weight or proffer good cause for doing otherwise.  *Id.*  "'Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), *including* [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *Winschel*, 631 F.3d at 1179 (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)) (alteration in original) (emphasis added).

In the instant case, on several occasions, Dr. Malik provided his diagnosis of Plaintiff based on Plaintiff's complaints and the medical test reports provided by other doctors (Tr. 491-94, 548).  Dr. Malik also made diagnoses based on his own personal observation and examination of Plaintiff (Tr. 548).  Moreover, Dr. Malik's treatment notes provide

descriptions of Plaintiff's symptoms and include recommendations for treatment (Tr. 494, 548).  *See, e.g.*, *Winschel*, 631 F.3d at 1179 ("The treating physician's treatment notes included a description of Winschel's symptoms, a diagnosis, and a judgment about the severity of his impairments, and clearly constituted [a medical opinion].").  Accordingly, the undersigned finds Dr. Malik has rendered a medical opinion.  Although Dr. Malik did not assess functional limitations, his statements nonetheless reflect judgments about the nature and severity of Plaintiff's symptoms, including his pain. Dr. Malik's opinion is therefore particularly relevant to the determination of Plaintiff's credibility.

As Dr. Malik was a treating physician who rendered an opinion, the ALJ was required to address Dr. Malik's opinion and state the weight it was to be given, and the reasons therefor. *Winschel*, 631 F.3d at 1179.  "With good cause, an ALJ may disregard a treating physician's opinion, but he must clearly articulate [the] reasons for so doing." *Id.* (alteration in original) (internal quotations and citations omitted).  Here, the ALJ failed to address or acknowledge Dr. Malik's opinion altogether (Tr. 17-22).  While failure to address the opinion of a treating physician is not *per se* fatal when, *inter alia,* a remand would amount to an "empty exercise," here a remand is already due given other errors committed by the ALJ.  *See Joyner v. Astrue*, No. 3:10-cv-255-J-TEM, 2011 WL 4530678, at *7-8 (M.D. Fla. Sept. 29, 2011) (discussing harmless error rule and remanding the case back to the Social Security Administration based on the conclusion that such a remand would not be an "empty exercise").[17]  Thus, the Court does not reach the question of harmless

---

[17] Notably, the court in *Joyner* stated:

> Here the ALJ's conflicting findings concerning Plaintiff's work capabilities
> (continued...)

error.

As it is impossible for the Court to tell if the ALJ properly considered and weighed all the evidence in the record, this case must be remanded.  *See Lawton*, 431 Fed. Appx. at 835 ("Although the ALJ is not required to specifically refer to every piece of evidence in the record, he is required to explain the weight he afforded to obviously probative exhibits.") (internal citations and quotations omitted); *Owens v. Heckler*, 748 F.2d 1511, 1515-17 (11th Cir. 1984) (declining to affirm an ALJ's decision where it was unclear what test the ALJ used in reaching his conclusions and concluding it was not proper to affirm simply because some rationale might have supported the ALJ's conclusions).  In making this determination, the Court has declined, as it must, to re-weigh the evidence in search of support for the ALJ's decision.  *Bloodsworth*, 703 F.2d at 1239.  On remand, the ALJ is directed to assess the opinion of Dr. Malik in the manner provided for by law.

### B.      Plaintiff's Credibility

Plaintiff argues the ALJ improperly evaluated his credibility regarding his subjective complaints of pain (Doc. #15 at).  For the reasons stated herein, the undersigned agrees.

An ALJ must consider all of a plaintiff's statements about his or her symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1520.  In so

---

[17](...continued)
    might, standing alone, constitute harmless error.  But in this instance, the conflicting findings, combined with the misstatements (or misconstructions) of the record and the lack of reference to a significant portion of the medical evidence, create the necessity for remand and further consideration of Plaintiff's case.

*Joyner*, 2011 WL 4530678, at *8.

doing, the ALJ must apply the Eleventh Circuit's three-part pain standard, which requires: (1) evidence of an underlying medical condition and either; (2) objective medical evidence substantiating the severity of the pain asserted or; (3) the objective medical condition is so severe that it can be reasonably expected to give rise to the pain asserted. *Foote*, 67 F.3d at 1560.

Credibility determinations reside within the sound discretion of the ALJ. *See Lanier v. Comm'r of Soc. Sec.*, 252 Fed. Appx. 311, 314 (11th Cir. 2007) (per curiam) (citing *Johns v. Bowen*, 821 F.2d 551, 557 (11th Cir. 1987)); *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991). If an ALJ gives at least three reasons for discrediting a plaintiff's subjective complaints of pain, a court may find the ALJ properly discredited the subjective pain testimony. *See Allen v. Sullivan*, 800 F.2d 1200, 1203 (11th Cir. 1989). When an ALJ decides not to credit a plaintiff's testimony about an asserted condition, the ALJ must articulate specific and adequate reasons based on substantial evidence for so doing, or the record must be obvious as to the credibility finding. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Jones*, 941 F.2d at 1532 (11th Cir. 1991). Thus, the ALJ does not need to specifically refer to every piece of evidence in rejecting a claimant's subjective pain testimony "so long as the ALJ's decision . . . is not a broad rejection which is not enough to enable the [court] to conclude that the ALJ considered her medical condition as a whole." *Barclay v Comm'r of Soc. Sec. Admin.*, 274 Fed. Appx. 738, 740-41 (11th Cir. 2008) (per curiam); *Dyer*, 395 F.3d at 1211.

In the instant case, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that

Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible (Tr. 19).  The ALJ discredited Plaintiff given the objective medical evidence, the Plaintiff's demeanor at the hearing, and the ALJ's inference that Plaintiff's experience volunteering belied his assertion that he constantly needed to move due to pain.  *Id.*

The ALJ found Plaintiff's testimony to be less than credible because Plaintiff's allegations of pain and limitation were not supported by the objective medical evidence (Tr. 19).  However, the ALJ's conclusion that Plaintiff's "allegations of pain and functional limitations are not entirely supported by the objective medical evidence" is necessarily intertwined with his conclusions regarding the medical opinion evidence.  Because the ALJ failed to adequately address pertinent parts of the opinions of Dr. Kollmer, Dr. Sanchez, and Dr. Malik, the Court must reverse on this issue as well.  As stated in SSR 96-7p, "the adjudicator must make a finding on the credibility of the individual's statements *based on a consideration of the entire case record.*"  Social Security Ruling (SSR) 96-7p, 1996 WL 374186, at *2 (emphasis added); *see also Williams v. Astrue*, No. 3:10-cv-235-J-JBT, 2011 WL 721501, at *3 (M.D. Fla. Feb. 22, 2011) (remanding for reconsideration of plaintiff's credibility regarding complaints of pain where ALJ failed to adequately address consulting examiner's opinion).

The ALJ also discredited Plaintiff's testimony because his allegations of requiring frequent movement were belied by the record (Tr. 20).  Specifically, the ALJ noted that Plaintiff did not exhibit a need for constant movement in his examinations and "likely has not exhibited this need for constant movement while volunteering."  *Id.* However, given the

findings of the undersigned with regards to Dr. Kollmer, Dr. Malik, and Dr. Sanchez, the undersigned finds this rationale as well lacks substantial evidence.  For instance, Dr. Sanchez stated Plaintiff would have difficulty maintaining a job where sitting or standing was involved (Tr. 478).  While that statement is ambiguous, it nevertheless implies a need for movement and was based on observations of Plaintiff made by Dr. Sanchez, presumably during an examination.  Moreover, Dr. Kollmer also stated that Plaintiff would have difficulty standing continuously for one to four hours and could not work for more than six hours in a day due to underlying joint difficulty (Tr. 428-30).  While the ALJ did not address this because she had erroneously discredited it, this opinion could lend support to Plaintiff's testimony and also, presumably, was based on observation conducted during examination.  Additionally, it is not clear where in the record the ALJ draws support for the inference that Plaintiff did not require much movement while volunteering.   The undersigned acknowledges that the ALJ may draw inferences from the record, however those inferences must nonetheless be based on substantial evidence.  As capacious as the substantial evidence standard is, it is not so capacious as to permit the use of mere conjecture and speculation to constitute substantial evidence.  *See, e.g.*, *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) ("The ALJ['s] . . . finding[s] must be supported by substantial evidence, *not mere intuition or conjecture.*") (emphasis added).  Accordingly, this rationale is not supported by substantial evidence.

The ALJ also relied on demeanor evidence in determining Plaintiff's testimony to be less than credible (Tr. 19-20).   The ALJ may consider a plaintiff's demeanor and appearance in arriving at a conclusion regarding credibility, but it cannot be the sole basis

for the ALJ's conclusion.  *Macia v. Bowen*, 829 F.2d 1009, 1011 (11th Cir. 1987) (per curiam); *see also Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985) ("In *Freeman*, we did not intend to prohibit an ALJ from considering the claimant's appearance and demeanor during the hearing.  Rather, an ALJ must not impose his observations in lieu of a consideration of the medical evidence presented.").  Because this is the sole remaining basis for the ALJ's conclusion to find Plaintiff less than credible, it cannot support the ALJ's finding that Plaintiff was less than credible.  Accordingly, the undersigned finds that the ALJ's conclusion regarding the credibility of Plaintiff is not supported by substantial evidence.  *See Macia*, 829 F.2d at 1011.

On remand, the ALJ must reevaluate Plaintiff's credibility in accord with the appropriate Regulations and prevailing case law.  If Plaintiff's subjective complaints are found to be less than fully credible, the reasons therefore must be sufficiently articulated.

### V.  Conclusion

For the foregoing reasons, the undersigned finds the decision of the Commissioner is neither supported by substantial evidence, nor decided according to proper legal standards.  The Commissioner's decision is hereby **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g).

On remand, the Commissioner should hold other proceedings as he deems necessary, but in any event should reweigh the opinion evidence and determine the appropriate weight to be given to the opinions of Plaintiff's treating physicians, Dr. Kollmer and Dr. Malik, as well as the opinions of the examining physician, Dr. Sanchez. Additionally, the ALJ should re-evaluate Plaintiff's credibility.

Plaintiff is cautioned, however, that this opinion does not suggest Plaintiff is entitled to disability benefits.  Rather, it speaks only to the process the ALJ must engage in and the findings and analysis the ALJ must make before determining whether Plaintiff is disabled within the meaning of the Social Security Act.  *Phillips*, 357 F.3d at 1244.

The Clerk of Court is directed to enter judgment consistent with this Order and Opinion, and thereafter to close the file.[18]

**DONE AND ORDERED** at Jacksonville, Florida this 13th day of August, 2012.


_____
THOMAS E. MORRIS
United States Magistrate Judge


Copies to all counsel of record

---

[18] If Plaintiff were to ultimately prevail in this case upon remand to the Social Security Administration, any motion for attorney fees under 42 U.S.C. § 406(b) **must be filed within thirty (30) days** of the Commissioner's final decision to award benefits.  *See Bergen v. Comm'r Soc. Sec.*, 454 F.3d 1273, 1278 n.2 (11th Cir. 2006) (recognizing under Fed. R. Civ. P. 54(d)(2)(B) the district court may enlarge the time for any attorney to petition for fees and suggesting time be stated in the judgment); *compare with* Fed. R. Civ. P. 54(d)(2)(B) and M.D. Fla. Loc. R. 4.18(a) (both requiring that unless a statute **or court order** provides otherwise, any motion for attorney fees must be filed no later than fourteen (14) days after entry of judgment) (emphasis added).      This Order and Opinion does not, however, extend the time limits for filing a motion for attorney fees under the Equal Access to Justice Act.